UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Lisa McLeod,                                                                Civil No. 05-764 (DWF/JJG)

        Plaintiff,

                                                                                                                                                                            **MEMORANDUM**

v.                                                                                        **OPINION AND ORDER**

South Washington County Schools,
Independent School District #833,
sued as South Washington Schools,
ISD #833,

        Defendant.

---

Stephen L. Smith, Esq., Law Firm of Stephen L. Smith, PLLC, counsel for Plaintiff.

Margaret A. Skelton, Esq., and Issac Kaufman, Esq., Ratwik, Roszak & Maloney, PA, counsel for Defendant.

---

Lisa McLeod, an African American woman, brought this against her former employer, South Washington County Schools, ISD # 833 (the "District"), after the District did not renew her contract. This matter came before the Court on July 28, 2006, pursuant to the District's Motion for Summary Judgment. For the reasons set forth below, the Court grants the motion.

## BACKGROUND

In 1999, pursuant to Minn. Stat. § 124D.896, Minnesota's Commissioner of Education promulgated the Desegregation Rule (the "Rule") in Chapter 3535 of the

Minnesota Rules.  The Rule provides financial incentives to schools that qualify to develop a voluntary integration plan to reduce racial isolation in schools and to create inclusive learning environments.  *See* Minn. R. 3535.0100.  The Rule was implemented in 2000.

The District, together with nine other St. Paul public schools, formed the East Metro Integration District ("EMID") to facilitate the development of programming in accordance with the Rule.  The EMID is made up of one school board member from each of the ten participating schools, and each school provides 50% of the funds it receives under the Rule to fund the EMID.

The District joined the EMID and began an integration program in the 2001-2002 school year.  A three-person committee managed the District's integration program until the end of the 2001-2002 school year, when the District decided it needed a diversity coordinator to oversee the integration program.  The goal of the new position was to develop and implement strategies that provide students enriched learning opportunities that are multicultural, diverse, racially integrated, and educationally sound.

On April 1, 2002, the District hired McLeod as the first diversity coordinator of its new Office of Equity and Integration.  At that time, McLeod was already working ten to fifteen hours a month for the District as a multicultural educator grant coordinator, and she asserts that she accepted the job as diversity coordinator with trepidation because of her prior experiences with the District.

*Problems Arise Between McLeod and the District*

When she was offered the position, McLeod knew that she would report to Sandra Kovatch, the District's director of curriculum and instruction. McLeod objected to this because she believed she should report to an assistant superintendent or directly to the superintendent. Nevertheless, Kovatch was McLeod's supervisor when McLeod started working for the District.

McLeod and Kovatch never had a good relationship. According to McLeod, Kovatch told McLeod that she would need to "justify" her position. McLeod frequently complained that Kovatch micromanaged her and checked McLeod's working hours. In addition, in October 2002, McLeod asked a District employee in Pupil Services for certain student data in the District's computer database. When the District employee initially denied McLeod's request, McLeod threatened to sue Kovatch for refusing to authorize the release of the data. Thereafter, the superintendent ordered that the data be released to McLeod, although McLeod claims she never received it.

Approximately four months after McLeod was hired, John Regan became the District's superintendent. Shortly thereafter, Regan assigned Linda Rull, an assistant superintendent, to be McLeod's supervisor, and he raised McLeod's salary to be in line with the salaries of other diversity coordinators in the EMID. At that time, McLeod was also given a private office, which she had been requesting since she started working.

Rull's relationship with McLeod did not begin well. McLeod informed Rull that she would not be micromanaged and, according to Rull, McLeod often became verbally abusive when a conflict arose. Despite her earlier request to be supervised by an assistant

3

superintendent, McLeod apparently believed that Regan should supervisor her, and McLeod frequently went to him, not Rull, with work-related issues.  During one meeting with Regan and Rull, McLeod stated that all of the District's white employees were racist.  Eventually, Rull asked Regan to assign McLeod to someone else.  Regan denied the request.

In January 2003, Regan hired Violet Arnold, a workplace diversity consultant, to address issues between McLeod and the District staff.  Arnold held several meetings with McLeod, her supervisors, and staff.  McLeod admits that these meetings alleviated some tension between herself and the District.  From those meetings and based on McLeod's assessment of the situation, Arnold determined that the relationship was "1,000 % dysfunctional" and that the primary source of conflict between Rull and McLeod involved how to spend the District's integration funds.

Although the School Board approved the annual integration budget, McLeod was tasked with determining the best use of the funds for her program.  McLeod and the District, the District's staff, and the School Board disagreed about how McLeod should spend the funds.  Specifically, a dispute arose concerning whether integration funds could be used to fund the Seeking Educational Equity and Diversity ("SEED") program.  The SEED program addresses race, age, gender, and sexual orientation issues and is designed to foster a more inclusive climate in the classroom.  McLeod believed that integration funds could not be used for the SEED program because it did not focus solely on race issues and because she had received complaints from parents about the SEED program.  McLeod asked Rull for data about the SEED program's success; she never received it.

Rull disagreed with McLeod's position that integration funds could not be used for the SEED program, especially since other EMID schools funded their SEED programs with integration dollars. In addition, Rull and other District staff disagreed with McLeod's practice of (1) paying parents stipends to volunteer; (2) paying certain parents and community members at rates higher than those reserved for teachers through the union contracts; (3) hiring salaried EMID employees as diversity consultants; (4) authorizing expenses for out-of-state conferences; and (5) incurring certain food and gift-related expenses.

In July 2003, the District hired three integration specialists for the Office of Equity and Integration. The three new employees were tasked with implementing an integration program at the schools in the District. McLeod supervised these employees and other staff in the Office of Equity and Integration, and she was responsible for providing a connection between the integration specialists and the staff at the individual schools. After Regan received a complaint from a temporary administrative assistant about McLeod, Arnold met with McLeod, the integration specialists, and other staff who worked with McLeod to resolve the conflicts in the Office of Equity and Integration.

As the diversity coordinator, McLeod was required to meet with other diversity coordinators in the EMID. During the 2003-2004 school year, McLeod attended only three of the ten scheduled meetings. McLeod was also required to work with the St. Paul Public Schools, in particular with the Inter-District Classroom Partnership Initiative. There was little contact, however, between McLeod and the St. Paul Public Schools, and she was late submitting information the Initiative needed.

McLeod also had disputes with other District employees. For instance, an employee in the Finance Department returned invoices to McLeod, asking her to complete the invoices and attach receipts. In response, McLeod accused the employee of being racist and refused to attend a meeting Rull scheduled between McLeod and the employee. Another employee filed a complaint after McLeod confronted him about an issue relating to the District's smoking policy. After Regan investigated and partially substantiated the complaint, Regan verbally reprimanded McLeod. In addition, Regan received complaints from at least three principals about McLeod. And, despite invitations from Regan and Rull, McLeod sometimes refused to attend meetings to discuss what was happening with her office. Finally, although some parents supported McLeod's work, Regan and others received at least ten complaints about McLeod's work and her demeanor.

*School Board's Decides Not to Renew McLeod's Contract*

On June 24, 2004, the School Board voted not to renew McLeod's contract, which was to expire on June 30, 2004. Although the School Board usually asked Regan for a recommendation with respect to contract decisions, the School Board voted without asking for Regan's recommendation. According to one School Board member, who called Rull for her input before the meeting, she voted not to renew McLeod's contract because of a (1) perceived lack of improvement in the District's integration and desegregation programs; (2) concern over the expenditure of integration funds; and (3) McLeod's relationship with District staff and parents. Regan disagreed with the

6

School Board's decision because he thought McLeod should be given more time to implement her program.

Shortly after the School Board voted not to renew McLeod's contract, the District hired Emanuel Dolo, a native of Liberia, as its new diversity coordinator.

*Present Dispute*

On April 13, 2005, McLeod commenced the present action in this Court. In her Amended Complaint, she asserts three causes of action:  (1) wrongful termination in violation of Minnesota's Whistleblower Protection Act, Minn. Stat. § 181.932; (2) retaliation in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Minnesota Human Rights Act ("MHRA"); and (3) race discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and MHRA.[1]  The District now moves for summary judgment on all claims.[2]

---

[1] McLeod failed to file a charge of discrimination with the Equal Employment Opportunity Commission within 180 days of the non-renewal of her contract, and she failed to file a charge with the Minnesota Department of Human Rights.  Accordingly, she could not allege any Title VII claims.  *See* 42 U.S.C. § 2000e-5.

[2] In connection with her opposition memorandum, McLeod submitted a post-deposition declaration.  The Eighth Circuit disapproves of the use of such declarations and has confirmed that post-deposition declarations must be stricken if they directly contradict previous deposition testimony.  *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365-66 (8th Cir. 1983).  In this case, the Court declines to strike McLeod's declaration because its inclusion in the record does not change the Court's analysis.  Nonetheless, the Court cautions against the submission of post-deposition declarations.

## DISCUSSION

**I.    Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences, which may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). As the United States Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

**II.    Whistleblower Protection Act**

In Count I, McLeod asserts a claim of wrongful termination in violation of the Minnesota Whistleblower Act, Minn. Stat. § 181.932. That act prohibits retaliation

against an employee who, in good faith, reports a violation or suspected violation of any federal or state law to an employer, governmental body, or law enforcement official. *Cokley v. City of Otsego*, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001). A claim under this act is analyzed under the *McDonnell Douglas* framework: McLeod has the initial burden of establishing a prima facie case, the burden then shifts to the District to articulate a non-retaliatory reason for McLeod's termination, after which McLeod may show that the District's proffered reason is a pretext for unlawful retaliation. *Id; see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

The elements of the prima facie case of retaliation under the Minnesota Whistleblower Act are: (1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two. *Cokley*, 623 N.W.2d at 632. McLeod claims that she engaged in statutorily protected activity when she repeatedly informed the District that the use of integration funds for non-integration purposes, specifically for SEED purposes, contravened the administrative rules governing integration funds. (McLeod's Opp. Mem. at 12.) She fails, however, to provide any details about when and to whom she made those reports of suspected violations. (*Id*.) Given this, the Court is doubtful that McLeod actually engaged in protected activity when, at most, she had verbal conversations with some District employees about the use of integration funds for non-integration purposes. *Cokley*, 623 N.W.2d at 632; *Hedglin v. City of Willmar*, 582 N.W.2d 897, 902 (Minn. 1998) (concluding vague reports of conduct, where no statute or rule is violated by such conduct, are not protected activity).

Assuming McLeod did engage in statutorily protected activity, she fails to establish a causal connection between her alleged protected activity and the decision not to renew her contract. In fact, McLeod does not discuss this element except to say that a jury should decide whether there is a causal connection. (McLeod Opp. Mem. at 2.) An employee may prove causation with "circumstantial evidence that justifies an inference of retaliatory motive." *Cokley*, 623 N.W.2d at 632. Close proximity between an employee's complaint and her termination of employment, without any other circumstantial evidence, fails to raise an issue of material fact regarding causation. *Id*. at 633.

Here, McLeod fails to allege temporal proximity or any other circumstantial evidence to establish a causal connection. Without more, the mere fact that, sometime before her contract was not renewed, McLeod voiced her views about how the integration funds should be spent does not raise a genuine issue of material fact with respect to causation. *See Green v. Franklin Nat'l Bank of Minneapolis*, --- F.3d ---, 2006 WL 2419171 *9 (8th Cir. Aug 23, 2006) (summarizing law on causal connection); *Pope v. ESA Serv., Inc.*, 406 F.3d 1001, 1010-11 (8th Cir. 2005) (concluding no causation was established when only evidence presented was that plaintiff complained four months before termination); *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (stating that a "mere coincidence of timing can rarely be sufficient" to establish causation). Therefore, because McLeod has failed to establish a prima facie case, the Court grants the District's motion with respect to Count I. *Celotex*, 477 U.S. at 322 (explaining party is entitled to summary judgment where opponent has failed to

10

establish the existence of an element essential to its case and on which it bears the burden of proof).

**III.    Section 1981**

In Counts II and III, McLeod alleges claims of retaliation and racial discrimination in violation of § 1981, which, in relevant part, protects a person from discrimination on the basis of race in the making and enforcing of contracts.  *See* 42 U.S.C. § 1981(a). Although not specifically referenced in the statute, § 1981 applies to employment contracts.  *See Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975).

The Supreme Court has held that 42 U.S.C. § 1983 provides the exclusive federal damages remedy for violations of the rights guaranteed by § 1981 when the claim is against a state actor.  *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989). McLeod did not plead a claim under § 1983.  She essentially concedes that under *Jett*, her § 1981 claims fail because she did not allege them under § 1983.  (McLeod Opp. Mem. at 10-11.)  The Court agrees that the § 1981 must be dismissed.  *Accord Ebrahimi v. City of Huntsville Bd. of Ed.,* 905 F. Supp. 993, 994-95 (N.D. Ala. 1995).

Without filing a proper motion, McLeod asks the Court to grant her leave to amend the Amended Complaint to add a § 1983 claim.  Federal Rule of Civil Procedure 15 states that leave to amend should "be freely given when justice so requires." Fed. R. Civ. P. 15(a).  Permission to amend may be withheld if a plaintiff does not have colorable grounds for relief; if she is guilty of undue delay, bad faith, dilatory motive; or if permission to amend would unduly prejudice the opposing party.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  McLeod cannot avoid summary judgment simply by asking for

leave to amend the Amended Complaint.  S*ee N.  States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) (finding rationale of *Overseas Inns S.A. P.A. v. United States*, 911 F.2d 1146, 1150-51 (5th Cir. 1990), persuasive when the court refused to grant leave to amend when party sought to add a claim in an effort to avoid summary judgment).  As discussed below, McLeod does not have a colorable ground for relief under § 1983.  Given this and because the District would be prejudiced if leave were granted, the Court will not allow McLeod to amend her complaint for a second time.  *Forman*, 371 U.S. at 182.

If McLeod had alleged a claim under § 1983, it would fail.  Generally, a governmental entity is not liable under § 1983 for the actions of its employees under a theory of respondeat superior.  *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  For the District to be liable under § 1983, McLeod must prove that the District had an official policy or widespread custom that violated the law and caused her injury.  *See id*.  The requirement of an official policy ensures that the District is liable only for those acts that may fairly be said to be those of the District.  *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998).  An alleged illegal custom must be widespread and may only subject a school district to liability if it is pervasive enough to have the "force of law." *Id*.  If a plaintiff can establish an official policy or widespread custom, the merits of a § 1983 claim are analyzed under the burden-shifting framework of *McDonnell Douglas. Putman v. Unity Health Sys.*, 348 F.3d 732, 735, n.2 (8th Cir. 2003).

McLeod's Amended Complaint and her opposition memorandum allege acts by Kovatch, Rull, and a few other District employees. Specifically, she asserts that these employees discriminated against her by resisting her implementation of the desegregation program. She alleges that she was the only person of color in the District and that the District's employees did not like that an African American woman was an administrator. She does not allege that any employee made racial remarks to her; rather, she asserts that the District's treatment of her made her feel like an "outcast" because she was "micromanaged" and "viewed through a microscope." (McLeod Opp. Mem. at 2-3.)

These allegations hinge on isolated incidents of alleged mistreatment by a few District employees. Nowhere does McLeod allege that the District itself had an official policy endorsing racial harassment. Nor does she provide evidence that the District delegated its policy-making authority, which generally lies with the School Board, to any of these individuals. She has provided no evidence that the District allowed or ignored other racial harassment. Finally, there is nothing in the record to indicate that McLeod has additional facts that she has not pled to support a § 1983 claim.[3] Therefore, assuming her allegations to be true, McLeod could not prove that she was racially harassed pursuant to a policy or custom of the District. Accordingly, she does not have a viable claim under § 1983. *See Artis v. Francis Howell North Band Booster Assoc., Inc.*, 161 F.3d 1178, 1181 (8th Cir. 1998).

---

[3] In its supporting memorandum, the District argues that McLeod cannot establish a policy or custom. McLeod did not respond to this argument in her opposition memorandum. Rather, she argued that *Jett* should be overruled or that she should be given leave to amend her complaint. (McLeod Opp. Mem. at 10-11.)

In sum, McLeod's § 1981 claims must be dismissed because the proper avenue to pursue such claims is under § 1983.  Even if McLeod could pursue § 1983 claims, those claims would fail because she cannot establish that the District had a policy or custom of racial discrimination.[4]  Therefore, the Court grants the District's motion with respect to the § 1981 claims.

## IV. MHRA

In Counts II and III, McLeod alleges claims of retaliation and racial discrimination in violation of the MHRA.  The elements of a MHRA discrimination claim are the same as discrimination claims under Title VII, § 1981, and § 1983.  *Cronquist v. City of Minneapolis*, 237 F.3d 920, 926 (8th Cir. 2001); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1056 (8th Cir. 1997).  Therefore, as the parties agree, the Court uses the burden-shifting framework of *McDonnell Douglas* to analyze McLeod's MHRA claims, and in doing so, it may rely on Title VII, § 1981, § 1983 cases.

### A. Retaliation

To establish a prima facie case of retaliation, McLeod must show (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action.  *Shanklin v. Fitzgerald,* 397 F.3d 596, 603 (8th Cir. 2005).  The District then may rebut the McLeod's prima facie case by advancing a legitimate, non-retaliatory reason for the

---

[4] If McLeod had established a policy or custom, any § 1983 claims would fail nonetheless because, as discussed above, she cannot establish the causation element of her prima facie case of retaliation.  *See Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 760 (8th Cir. 2004) (explaining elements of retaliation claim under § 1981).

14

adverse action it took against McLeod. *Id*. If the District makes this showing, McLeod must demonstrate that the District's proffered reason was a pretext for illegal retaliation. *Id.*

Here, McLeod alleges that she engaged in protected activity when she openly opposed the District's discriminatory practices, sought information from the District, and encouraged African American parents to speak at school board meetings. Assuming these acts are protected activity, for the reasons discussed above, the mere fact that, sometime before her contract was renewed, McLeod allegedly engaged in protected activity is insufficient by itself to establish causation. Therefore, McLeod cannot establish a prima facie case, and the Court grants the District's motion with respect to McLeod's claim of retaliation under the MHRA. *Celotex*, 477 U.S. at 322.

      **B.**    **Racial Discrimination**

To establish a prima facie case of racial discrimination under the MHRA, McLeod must show: (1) that she is a member of a protected class; (2) that she was meeting the District's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently. *Tolen v. Ashcroft*, 377 F.3d 879, 883 (8th Cir. 2004). If McLeod can make out a prima facie case, the District must come forward and identify a legitimate, non-discriminatory reason for the adverse employment action. *Id*. If the District meets this burden of production, the presumption raised by the prima facie case disappears, and the burden shifts back to McLeod to show that the articulated reason was a pretext for discrimination. *Id.*

15

The parties agree that McLeod has established the first and third elements of her prima facie case. They disagree about whether she has established the second and fourth elements. Case law is clear that McLeod must demonstrate that she was actually performing her job at a level that met the District's legitimate expectations. *See Whitley v. Peer Review Sys., Inc.*, 221 F.3d 1053, 1055 (8th Cir.2000); *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 793 (8th Cir. 2004) (summary judgment proper when employee knew she was not performing her duties in a way that the employer legitimately expected); *Richmond v. Bd. of Regents of Univ. of Minn.*, 957 F.2d 595, 598 (8th Cir. 1992) (employee's prima facie case failed because poor work performance showed that she was not qualified for her job).

The District asserts that McLeod was not meeting its legitimate expectations. It points out that it had to hire Arnold as an outside consultant to specifically address problems between McLeod and other District employees and that Regan had to verbally reprimand McLeod after she yelled at another employee about the smoking policy. In response, McLeod highlights the fact that Regan disagreed with the School Board's decision not to renew McLeod's contract and that McLeod never received a formal performance evaluation during her tenure. Viewing this evidence in the light most favorable to McLeod, the Court concludes that there is no genuine issue of material fact with respect to whether McLeod was meeting the District's legitimate expectations. She was not.

Although Regan believed McLeod should be given more time to implement an integration program, he also acknowledged that he had serious concerns about McLeod's

performance. That an employee meets some expectations does not mean she meets the standard if she fails to meet other significant expectations. *Calder v. TCI Cablevision of Mo., Inc.*, 298 F.3d 723, 729 (8th Cir.2002). As the diversity coordinator, McLeod was tasked with being a liaison between her office and the District staff, the District's schools, and the EMID. Yet, she had numerous conflicts with staff; some school principals complained about her; she refused to attend meetings when her attendance was requested; and she failed to effectively implement a desegregation program under the Rule. Given this, she was not meeting significant, legitimate expectations of the District. Because McLeod is unable to establish that she was performing her job in accordance with the District's legitimate expectations, she cannot establish a prima facie case. Therefore, summary judgment is appropriate on McLeod's claim of race discrimination under the MHRA. *Celotex*, 477 U.S. at 322.

## CONCLUSION

For the reasons stated above, **IT IS HEREBY ORDERED THAT**:

1. South Washington County Schools' Motion for Summary Judgment (Doc. No. 23) is **GRANTED**.

2. Lisa McLeod's Amended Complaint (Doc. No. 16) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: August 25, 2006              s/Donovan W. Frank
                                    DONOVAN W. FRANK
                                    Judge of United States District Court